IN THE DISTRICT COURT OF BECKHAM COUNTY
STATE OF OKLAHOMA

BECKHAM COUNTY
FILED
DEC 19 2018
BY DONNA HOWEN COURT CLERK
DEPUTY

KENNETH HAROLD TIBBETTS,  )
      Petitioner,  )
vs.  )    Case No. CF-2015-188
      )
STATE OF OKLAHOMA,  )
      Respondent.  )

## STATE'S ANSWER TO PETITIONER'S
## APPLICATION FOR POST CONVICTION RELIEF

COMES NOW Angela C. Marsee, the duly elected District Attorney for the Second Judicial District, by and through Julia O'Neal, Assistant District Attorney and respectfully requests the Defendant's Application be denied.

1. The Petitioner entered a plea of guilty on February 20, 2016 with sentencing held on March 30, 2016. The Petitioner was sentenced to life sentences on Count 1, 3, 4, 5, and 6 and 10 years on count 2 and 7 with the Department of Corrections.
2. The Petitioner filed an application to withdraw plea of guilty on April 6, 2016
3. A hearing was held on May 11, 2016 wherein this Honorable Court overruled the application.
4. On May 18, 2016, the Petitioner filed a Notice of Intent to Appeal. The Petitioner alleged eight propositions of error.
   a. The trial court failed to conduct a meaningful inquiry into petitioner's competence.
   b. There was insufficient factual basis for the plea and therefore his plea was not knowingly, intelligently and voluntarily given.
   c. Petitioner did not receive adequate information on the punishment ranges; therefore it was error to overrule the application to withdraw the guilty plea.
   d. Imposition of the sentence violated constitutional protections against double jeopardy
   e. It was error to admit documents protected by doctor-client privilege.
   f. Prosecutorial misconduct
   g. Ineffective assistance of trial counsel.
   h. Cumulative errors deprived the petitioner of a fair proceeding.
5. On September 14, 2017, the Oklahoma Court of Criminal appeals denied the Petitioner's direct appeal.
6. The Petitioner filed a Post-Conviction Relief application alleging two errors (1) ineffective assistance of counsel and (2) the trial court's lack of subject matter jurisdiction. However, he outlines the following also:
   a. Waiver Doctrine 22 O.S. §1086 does not apply to fundamental constitutional claims.

1

EXHIBIT 15

    b.  Ineffective Assistance of counsel due to actual conflict of interest with his retained counsel of record.
    c.  Beckham County was without subject matter jurisdiction
    d.  Ineffective  assistance of counsel due to deficient performance which was caused by a conflict of interest
    e.  Ineffective assistance of appellate counsel

## ARGUMENTS AND AUTHORITIES

### A.  OKLA. STAT. tit. 22 §1086 Waiver doctrine - Subsequent Application

All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application.[1]

The "court's consideration of a petitioner's claims is strictly limited by the provisions of the Uniform Post-Conviction Procedure Act. The application of the act is limited to only those claims which, for whatever reason, could not have been raised on direct appeal. Issues which were raised and decided on direct appeal are barred from further consideration by res judicata. Issues which were not raised on direct appeal, but could have been raised are waived. An exception to these rules exists when the court finds a ground for relief asserted which for sufficient reason was not asserted or was raised inadequately in the prior application for post-conviction relief or when an intervening change in constitutional law impacts the judgment and sentence."[2]

The Petitioner's allegation of ineffective assistance of counsel based on conflict of interest could have been raised on his direct appeal and in fact he did argue that his trial counsel failed to properly investigate his competency, etc.  All matters that the Petitioner alleges could have been raised on direct appeal and were not, therefore, are barred from further consideration.

---

1 OKLA. STAT. tit. 22 §1086.
2 *Woodruff v. State*, 1996 OK CR 5, ¶2, 910 P.2d 348.

107

### B. Petitioner's trial counsel was not Ineffective:

Petitioner alleges that his attorney acted under multiple diverging interests which affected her performance as his attorney which deprived him of his 6th Amendment right.[3]

These matters could have been raised on direct appeal. For this reason, these issues are waived for further review. However, if the issues raised in this application were addressed by the Court of Criminal Appeals, the analysis would start with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. A Petitioner must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. The Court has stated that the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his *overall performance.*[4] In order to prevail on an ineffective assistance of counsel claim, a petitioner must show he received ineffective assistance of counsel, that is, he must demonstrate that the performance of his counsel was deficient and unreasonable and that he was prejudiced thereby. And in order to establish prejudice, a Petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

The Oklahoma Rules of Professional Conduct, Rule 1.7 addresses conflicts of interests for attorneys to be aware of.[i] An attorney must be aware and prevent any conflicts unless waived by the client.

In his attempt to show conflict of interest, Petitioner alleges that his trial counsel was retained by his wife and in fact money that she paid to her attorney was transferred to Petitioner's trial counsel. Without more than this information, mere payment by his wife does not provide a conflict of interest. (See Comment 13 of Rule 1.7)[ii]

The petitioner next alleges his trial counsel was law partners with his wife's attorney who transferred money she had paid him to Petitioner's trial counsel.

In a Nebraska case, the court held the asserted conflict of interest must be actual, rather than speculative or hypothetical. The attorney in the case testified that although he did rent

---

3 See pg 10 Petitioner's brief.
4 *Malone v. State*, 2013 OK CR 1 ¶15, 293 P.3d 198.

office space from a senior partner in the firm which included the attorney in question, the attorney was an independent practitioner as evidenced by the sharing of office space and certain expenses only. The attorney did not recall sharing any information which could not have been found in police reports or in other sources. Moreover, the petitioner did not introduce any evidence to support his claim that he was prejudiced by the rental agreement. The Nebraska court found that "no partnership existed" between the attorneys.[5] The petitioner does not provide any evidence that his trial counsel and his wife's attorney were in a partnership. Further there is no evidence that the attorneys communicate about the Petitioner's case nor that it affected the outcome.

The Petitioner further alleges his trial counsel was friends with Dana Southall and Jenna Dodson. He claims Dana Southall and Jenna Dodson are granddaughters of the victims, Troy and Joy Sites. He provides no proof that they are related and in fact they are not related. The person in the pictures provided by the Petitioner as evidence is not Ms. Sites.

The Petitioner also contends his trial counsel failed to consider his mental state at time of pleading. This allegation has already been addressed by Petitioner's direct appeal which the Court of Criminal Appeal determined in their Opinion had been waived.

Petitioner further contends that his trial counsel did not have his best interests when she counseled him to enter a blind plea before Judge Haught. Trial strategy is up to the attorney and without more, this does not prove conflict of interest. The Honorable Judge Haught had sufficient evidence at the sentencing hearing to order the sentences he did.

Without more, this proposition is waived and is without basis and must fail.

### C. Subject matter jurisdiction was proper in Beckham County District Court

Issues of subject matter jurisdiction are never waived and can therefore be raised on collateral appeal." *Wallace v. State*, 1997 OK CR 18, 15, 935 P.2d 366, 372.

The Petitioner states and provided that he is an enrolled member of the Osage Nation. The Petitioner further alleges incidences he was convicted of occurred in the Cheyenne Arapaho Reservation. Petitioner cites the 10th Circuit's decision in *Murphy v. Royal* and argues that he is

---

5 *State v. Fletcher*, 253 Neb. 1029, 573 N.W.2d 752 (Neb., 1998).

109

entitled to post-conviction relief based upon that case for the reason Beckham County District Court was without jurisdiction.   The Petitioner is mistaken.

The State does not agree that the Cheyenne-Arapaho Reservation existed when Petitioner's crime was committed. It is the position of the State of Oklahoma that the United States Congress properly de-established the Cheyenne-Arapaho Reservation in 1891, and that there is no evidence that the boundaries of the reservation were ever re-established by Congress. Additionally, the land where the offense occurred, Janie's Garden Center, 305 North Adams, Elk City and United Grocery Store parking lot at 2700 W. 3rd Street, Elk City, Beckham County, Oklahoma, is not now nor was it at the time of the crime, trust land.

The State of Oklahoma disagrees with this assertion. While Murphy v. Royal did address the reservation of the Muscogee-Creek Nation, it did not entirely eliminate the State of Oklahoma from having jurisdiction over members of Native American tribes on land which was formerly reservation. The 10th Circuit sitting en-blanc specifically explained Murphy in light of the General Allotment Act, and noted how the dealing with the Muscogee-Creek Nation was different from tribes that were included within the General Allotment Act.  See Act of Feb. 8, 1887 ch 119, 24 Stat. 388. (See Exhibit 1)

### Historical Background

The term, Indian Reservation, has come to describe federally- protected Indian tribal lands, this means those lands that congress has set apart for tribal and federal jurisdiction. *Indian Country, U.S.A.*, 829 F.2d at 973.

The Major Crimes Act applies to certain enumerated crimes committed by Indians in "Indian Country" giving jurisdiction exclusively to the Federal Government. See *Negonsott v. Samuels*, 507 U.S. 99, 103 (1993). The Major Crimes Act itself reads:

> "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, named, murder… within Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

18 U.S.C. Section 1153(a).

Federal Statute describes Indian Country as:

> (a) All land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation.

110

    (b) All dependent Indian communities within the borders of the United States whether within
       the original or subsequently acquired territory thereof, and whether within or without the
       limits of a state, and
    (c) All Indian allotments the Indian titles to which have not been extinguished including
       rights-of-way running through the same.

18 U.S.C. section 1151.

      Only Congress may disestablish or diminish a reservation *Lone Wolf v. Hitchcock*, 187

U.S. 553 (1903). "Congress possesses the power over Indian affairs, including the power to

modify or eliminate tribal rights" *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343

(1998). The Supreme Court in light of this precedent has developed frame work to determine if

Congress has in fact disestablished or diminished Indian reservations. Congress may disestablish

or diminish reservation land, however it's intent must be "clear and plain." *Yanktox Sioux Tribe*,

522 U.S. at 343 (quoting *United States v. Dion*, 476 U.S. 734, 738-39 (1986)).

      The General Allotment Act of February 8, 1887, 24 Stat., 388 as amended 34 Stat. 182,

authorized the President of the United States to allot portions of reservation land to tribal

members, and with the consent of the Tribes, to sell surplus land to settlers. The Act of March 2,

1889, 25 Stat. 980 further established the Jerome Commission to negotiate the terms of treaties

or agreements with the individual Tribes.

      The Cheyenne and Arapaho Tribe was part of these subsequent dealings, and in The Act

of March 3, 1891, 26 Stat 989, 1022, agreed upon October 13 1890 and ratified by Congress on

March 3rd 1891 specifically dealt with the lands owned by the Cheyenne and Arapaho Tribes.

The agreement provided that each member of the Cheyenne or Arapahoe Tribe could choose 160

acres for their individual allotment. *Id.* at 1023. Title to these individual allotments would be

held in trust and the United States would pay the tribe a total of $1,500,000. *Id.* at 1024.

**Solem Framework**

      In *Solem v. Bartlett*, 465 U.S. 463 (1984), the Supreme Court set out a three part test for

determining whether Congress has altered reservation boundaries. There is an assumption against

disestablishment and diminishment but not one which cannot be overcome.

      First, under *Solem* framework the text of the statute purporting to disestablish or diminish

must be looked at. The court has stated that this factor is "the most probative evidence of

congressional intent." *Id.* at 470. The court further states "Explicit reference to cession or other

language evidencing the present and total surrender of all tribal interests strongly suggests that

Congress meant to divest from the reservation all unalloted opened lands." *Id.* At 470. And finally "when such language is combined with language committing Congress to compensate the tribe for its land with a fixed sum, Congress's intent to diminish a reservation is especially clear."

Speaking on the first *Solem* factor, the Supreme Court in *Nebraska v. Parker* mentioned three "Hallmarks of diminishment" including

- Explicit references to cession of surrender of tribal interests
- Unconditional congressional commitments to compensate the tribe with a fixed sum for the total surrender of tribal claims to opened lands, and
- Provisions restoring reservation lands to "the public domain"

*Nebraska v. Parker*, 136 S. Ct 1072, 1079 (2016). Present in this case dealing with the Cheyenne and Arapaho Tribes are all three Hallmarks. The explicit and clear language of the agreement, coupled with the congressional commitment of a fixed sum of $1,500,000 to compensate the tribes, as well as the land being treated as public domain going forward all point towards clear congressional intent when dealing with the Cheyenne and Arapaho Tribes.

While allotment alone is not sufficient to prove the intent of Congress to disestablish a reservation see *Mattz v. Arnett*, 412 U.S., 481, 497 (1973), As noted in *Nebraska v. Parker*, the text of the statute used for allotment can significantly help the court determine the intent of Congress.

This first factor overwhelmingly points to the Cheyenne-Arapaho Reservation as having been properly disestablished by Congress. The statute, passed by Congress stated,

"Subject to the allotment of land in severalty to the individual members of the Cheyenne and Arapahoe tribes of Indians, as herein-after provided for and subject to the conditions hereinafter imposed for the consideration hereinafter mentioned the said **Cheyenne and Arapahoe Indians hereby cede, convey, transfer, relinquish and surrender forever and absolutely, without any reservation whatever express or implied, all claim, title, and interest, of every kind and character,** in and to the lands embraced in the following described tract of country in the Indian Territory, to-wit:

Commencing at the point where the Washita River crosses the ninety-eighth degree of west longitude, as surveyed in the years eighteen hundred and fifty-eight and

eighteen hundred and seventy-one; thence north on a line with said ninety-eighth degree to the point where it is crossed by the Red Fork of the Arkansas (sometimes called the Cimarron River); thence up said river, in the middle of the main channel thereof, to the north boundary of the country ceded to the United States by the Treaty of June fourteenth, eighteen hundred and sixty six, with the Creek nation of Indians; thence west on said north boundary and the north boundary of the country ceded to the United Stated by the treaty of March twenty first, eighteen hundred and sixty six, with the Seminole Indians, to the one hundredth degree of west longitude; thence south on the line said one hundredth degree to the point where it strikes the North Fork of the Red River; thence down said North Fork of the Red River to a point where it strikes the north line of the Kiowa and Comanche Reservation; thence east along said boundary to a point where it strikes the Washita River; thence down said Washita River in the middle of the main channel thereof, to the place of beginning: and all other lands or tracts of country in the Indian Territory to which they have or may set up or allege any right, title, interest, or claim whatsoever . "

In the *Murphy* decision cited by petitioner, the court expressly states that this kind of language is lacking in regards to the Muscogee-Creek Nation. "The State acknowledges that no relevant act of Congress contains language which expressly disestablished the Creek Nation Reservation through the use of words as 'cede' or 'relinquish' *Murphy v. Royal* 70 (10th Cir. 017). As noted above, the ratified agreement with the Cheyenne and Arapaho Tribes explicitly has this language. The individual tribes had different dealings with the United States Government.

In *Tooisgah v. United States*, 186 F.2d 93 (10th Cir. 1950) the 10th Circuit concluded that land in Caddo County had been properly disestablished, leaving the State Government with proper jurisdiction over a full blood Apache defendant for the murder of a full blood Comanche victim. "When, however the tribes occupying the reservation cede lands embraced within it to the United States, relinquishing and surrendering "all their claim, title, and interest", subject to the laws, both criminal and civil, of the state or territory... We think it cannot be doubted that Congress thereby intended to dissolve the tribal government, disestablish the organized reservation, and assimilate the Indian tribes as citizens of the state or territory".

8

The 10th Circuit, relying heavily upon *Tooisgah v. United States* held in *Ellis v. Page,* 351 F.2d 250 (10th Cir. 1965) that the Cheyenne and Arapahoe reservation was properly disestablished by Congress when they ratified the Cheyenne and Arapahoe Treaty of October 1890 (ratified in 1891), 25 Stat. 1022. And further notes "The Comanche, Kiowa, and Apache Treaty in *Tooisgah* and the Cheyenne and Arapahoe Treaty involved here were negotiated treaties or agreements, between the government and the Indian tribes by which in consideration of payment of money and allotments in severalty the tribes did "cede, convey, transfer, relinquish, and surrender, forever and absolutely without any reservation", all their claim in and to the lands embraced within the designated reservation. While the words of alienation employed in the treaties do not formally disestablish the reservations, we think they have the unequivocal effect of doing so."

The 10th Circuit further expanded upon its decision in *Cheyenne-Arapaho Tribes of Oklahoma v. The State of Oklahoma*, 618 F.2d 665 (1980). In its decision, the 10th Circuit notes "*Ellis v. Page*, 10 Cir., 351 F.2d 250, 252, holds that the Allotment and Cession Agreement, together with congressional ratification, disestablished the Cheyenne-Arapaho Reservation. The Tribes say, that they do not contest the district court's holding that the reservation is disestablished. The question is the effect of the disestablishment on the hunting and fishing rights of Indians" (*Cheyenne-Arapaho Tribes of Oklahoma v. The State of Oklahoma*, 618 F.2d 665 (8) (1980)

Second, the *Solem* framework looks to the "events surrounding the passage" of the statute. *Solem v. Barlett*, 465 U.S. 463, 471(1984). As discussed before, the United States Congress had passed the General Allotment Act. The Jerome Commission was negotiating with different tribes to open up land for settlement. Different agreements had different language used within them. The language chosen for the agreement with the Cheyenne and Arapaho Tribe was the clear intent of Congress.

Third, *Solem* considers "to a lesser extent, events that occurred after the passage "of the relevant statute. Id. As mentioned before, the General Allotment Act was passed to deal with settlement on land that was at the time reservation land. The subsequent treatment of the land is to be looked at in this factor. The land has not been treated as reservation land since ratification of the agreement by Congress. The precedent of the 10th Circuit clearly establishes this as well.

9



Furthermore, the lands in question were opened up to settlement and part of the land runs in the state.  Specifically, the third land run, of which there was close to 25,000 participants and occurred at high noon on April 19th, 1892.  The land run opened up nearly 4,300,000 acres of land, which was formerly part of the Cheyenne and Arapaho reservation, to settlement.

In conducting this three part analysis, the first factor so overwhelmingly points to the Cheyenne-Arapaho reservation being diminished by Congress, it is fundamentally different from the arguments presented in *Murphy v. Royal*. The text of the statute shows clear intent of Congress to withdraw all rights to the reservation. Under similar circumstances the 10th Circuit Court of Appeals has upheld the jurisdiction of the State of Oklahoma. Congress clearly intended to disestablish the Cheyenne-Arapaho reservation when they ratified The Act of March 3, 1891, 26 Stat 989, 1022, on October 13 1890.

The dealings between the Cheyenne-Arapaho Tribe and the United States Government were fundamentally different than those between the Muscogee-Creek Nation and the United States Government. The Cheyenne-Arapaho Reservation was properly disestablished by Congress and thus the State of Oklahoma has jurisdiction over the petitioner. Petitioner's reliance on *Murphy v. Royal* is misguided and under the framework set forth in *Solem*, as well as the precedent from the 10th Circuit.

This proposition must fail.

### D.  Petitioner's Appellate counsel provided effective assistance

Petitioner is correct; he is guaranteed effective assistance of counsel at the appellate level.  He did not allege any failings by his appellate counsel.  It may be assumed he is contending a failure to allege subject matter jurisdiction provided him ineffective assistance. However, based on the previous section, his appellate counsel was correct in not raising a frivolous claim.

This proposition must fail.

### Conclusion

In conducting this three part analysis, the first factor so overwhelmingly points to the Cheyenne-Arapaho reservation being diminished by Congress, it is fundamentally different from the arguments presented in Murphy v. Royal. The text of the statute shows clear intent of



Congress to withdraw all rights to the reservation. Under similar circumstances the 10th Circuit Court of Appeals has upheld the jurisdiction of the State of Oklahoma. Congress clearly intended to disestablish the Cheyenne-Arapaho reservation when they ratified The Act of March 3, 1891, 26 Stat 989, 1022, on October 13 1890.

Further without more, the propositions that the Petitioner received ineffective assistance of trial and appellate counsels fails in that no deficiencies were shown that would have provided a different result. If the Petitioner had taken the matter to trial, based on the information presented by the State of Oklahoma, there is little doubt the outcome would have been more unfavorable to the Petitioner.

Therefore, the State respectfully requests the Application be denied.

Respectfully,

ANGELA C. MARSEE
DISTRICT ATTORNEY

BY: 
Assistant District Attorney

## CERTIFICATE OF DELIVERY

This is to certify that on the ___19___ day of December, 2018, a true and correct copy of the above and foregoing Response was mailed to petitioner

Kenneth Tibbets #122414
Joseph Harp Correctional Center
P.O. Box 548
Lexington, Oklahoma 73051

Assistant District Attorney

11



Exhibits:

Exhibit 1: General Allotment Act See Act of Feb. 8, 1887 ch 119, 24 Stat. 388

Exhibit 2: The Act of March 3, 1891, 26 Stat 989, 1022, ratified on October 13 1890

---

[i]  Tit. 5, Ch. 1, App. 3-A, Rules of Professional Conduct, Rule 1.7 – conflict of interest
      (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the
   representation involves a concurrent conflict of interest. A concurrent conflict of
   interest exists if:
   (1) the representation of one client will be directly adverse to another client; or
   (2) there is a significant risk that the representation of one or more clients will be
   materially limited by the lawyer's responsibilities to another client, a former client or a
   third person or by a personal interest of the lawyer.
   (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a),
   a lawyer may represent a client if:
   (1) the lawyer reasonably believes that the lawyer will be able to provide competent and
   diligent representation to each affected client;
   (2) the representation is not prohibited by law;
   (3) the representation does not involve the assertion of a claim by one client against
   another client represented by the lawyer in the same litigation or other proceeding before
   a tribunal; and
   (4) each affected client gives informed consent, confirmed in writing.

[ii] Tit. 5, Ch. 1, App. 3-A, Rules of Professional Conduct, Rule 1.7, Comment [13]: A lawyer may
be paid from a source other than the client, including a co-client, if the client is informed of that
fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or
independent judgment to the client. See Rule 1.8 (f). If acceptance of the payment from any other
source presents a significant risk that the lawyer's representation of the client will be materially
limited by the lawyer's own interest in accommodating the person paying the lawyer's fee or by
the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with
the requirements of paragraph (b) before accepting the representation, including determining
whether the conflict is consentable and, if so, that the client has adequate information about the
material risks of the representation.



# STATUTES

OF THE

# UNITED STATES OF AMERICA.

PASSED AT THE

## FIRST SESSION OF THE FORTY-NINTH CONGRESS,

### 1885-1886,

AND

#### RECENT TREATIES AND EXECUTIVE PROCLAMATIONS.

EDITED, PRINTED, AND PUBLISHED BY AUTHORITY OF CONGRESS, UNDER THE
DIRECTION OF THE SECRETARY OF STATE.



WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1886.

1887, February 8 - 24 Stat. 388, Act for Allotment of Lands to Indians



388            FORTY-NINTH CONGRESS.  Sess. II.  Chs. 105, 119.  1887.

Remedy by existing law not impaired.

SEC. 2. That nothing in this act contained shall prevent, lessen, impeach, or avoid any remedy at law or in equity which any owner of letters patent for a design, aggrieved by the infringement of the same, might have had if this act had not been passed; but such owner shall not twice recover the profit made from the infringement.

Approved, February 4, 1887.

---

Feb. 8, 1887.

CHAP. 119.—An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes.

President authorized to allot land in severalty to Indians on reservations.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon in quantities as follows:

Distribution.

To each head of a family, one-quarter of a section;

To each single person over eighteen years of age, one-eighth of a section;

To each orphan child under eighteen years of age, one-eighth of a section; and

To each other single person under eighteen years now living, or who may be born prior to the date of the order of the President directing an allotment of the lands embraced in any reservation, one-sixteenth of a section: Provided, That in case there is not sufficient land in any of said reservations to allot lands to each individual of the classes above named in quantities as above provided, the lands embraced in such reservation or reservations shall be allotted to each individual of each of said classes pro rata in accordance with the provisions of this act: And provided further, That where the treaty or act of Congress setting apart such reservation provides for the allotment of lands in severalty in quantities in excess of those herein provided, the President, in making allotments upon such reservation, shall allot the lands to each individual Indian belonging thereon in quantity as specified in such treaty or act: And provided further, That when the lands allotted are only valuable for grazing purposes, an additional allotment of such grazing lands, in quantities as above provided, shall be made to each individual.

Provisos.
Allotment pro rata if lands insufficient.

Allotment by treaty or act not reduced.

Additional allotment of lands at for grazing only.

Selection of allotments.

SEC. 2. That all allotments set apart under the provisions of this act shall be selected by the Indians, heads of families selecting for their minor children, and the agents shall select for each orphan child, and in such manner as to embrace the improvements of the Indians making the selection. Where the improvements of two or more Indians have been made on the same legal subdivision of land, unless they shall otherwise agree, a provisional line may be run dividing said lands between them, and the amount to which each is entitled shall be equalized in the assignment of the remainder of the land to which they are entitled under this act: Provided, That if any one entitled to an allotment shall fail to make a selection within four years after the President shall direct that allotments may be made on a particular reservation, the Secretary of the Interior may direct the agent of such tribe or band, if such there be, and if there be no agent, then a special agent appointed for that purpose, to make a selection for such Indian, which selection shall be allotted as in cases where selections are made by the Indians, and patents shall issue in like manner.

Improvements.

Proviso.
On failure to select in four years, Secretary of the Interior may direct selection.

Sec. 3. That the allotments provided for in this act shall be made by special agents appointed by the President for such purpose, and the agents in charge of the respective reservations on which the allotments are directed to be made, under such rules and regulations as the Secretary of the Interior may from time to time prescribe, and shall be certified by such agents to the Commissioner of Indian Affairs, in duplicate, one copy to be retained in the Indian Office and the other to be transmitted to the Secretary of the Interior for his action, and to be deposited in the General Land Office.

*Allotments to be made by special agents and Indian agents.*

*Certificates.*

Sec. 4. That where any Indian not residing upon a reservation, or for whose tribe no reservation has been provided by treaty, act of Congress, or executive order, shall make settlement upon any surveyed or unsurveyed lands of the United States not otherwise appropriated, he or she shall be entitled, upon application to the local land-office for the district in which the lands are located, to have the same allotted to him or her, and to his or her children, in quantities and manner as provided in this act for Indians residing upon reservations; and when such settlement is made upon unsurveyed lands, the grant to such Indians shall be adjusted upon the survey of the lands so as to conform thereto; and patents shall be issued to them for such lands in the manner and with the restrictions as herein provided. And the fees to which the officers of such local land-office would have been entitled had such lands been entered under the general laws for the disposition of the public lands shall be paid to them, from any moneys in the Treasury of the United States not otherwise appropriated, upon a statement of an account in their behalf for such fees by the Commissioner of the General Land Office, and a certification of such account to the Secretary of the Treasury by the Secretary of the Interior.

*Indians not on reservations, etc., may make selection of public lands.*

*Fees to be paid from the Treasury.*

Sec. 5. That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: *Provided*, That the law of descent and partition in force in the State or Territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided; and the laws of the State of Kansas regulating the descent and partition of real estate shall, so far as practicable, apply to all lands in the Indian Territory which may be allotted in severalty under the provisions of this act: *And provided further*, That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner if in the opinion of the President it shall be for the best interests of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which such reservation is held, of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress, and the form and manner of executing such release shall also be

*Patent to issue.*

*To be held in trust.*

*Conveyance in fee after 25 years.*

*Proviso.*

*Period may be extended.*

*Laws of descent and partition.*

*Negotiations for purchase of lands not allotted.*



390                   FORTY-NINTH CONGRESS. Sess. II. Ch. 119.   1887.

Lands so bought to be held for actual settlers if arable. — prescribed by Congress: *Provided however*, That all lands adapted to agriculture, with or without irrigation so sold or released to the United States by any Indian tribe shall be held by the United States for the sole purpose of securing homes to actual settlers and shall be disposed of by the United States to actual and bona fide settlers only in tracts not exceeding one hundred and sixty acres to any one person, on such terms as Congress shall prescribe, subject to grants which Congress may make in aid of education: *And provided further*, That no patents

Patent to issue only to person taking as homestead. — shall issue therefor except to the person so taking the same as and for a homestead, or his heirs, and after the expiration of five years occupancy thereof as such homestead; and any conveyance of said lands so taken as a homestead, or any contract touching the same, or lien thereon, created prior to the date of such patent, shall be null and void.

Purchase money to be held in trust for Indians. — And the sums agreed to be paid by the United States as purchase money for any portion of any such reservation shall be held in the Treasury of the United States for the sole use of the tribe or tribes of Indians; to whom such reservations belonged; and the same, with interest thereon at three per cent per annum, shall be at all times subject to appropriation by Congress for the education and civilization of such tribe or tribes of Indians or the members thereof.  The patents aforesaid shall be recorded in the General Land Office, and afterward delivered, free of charge, to the allottee entitled thereto.  And if any religious

Religious organizations. — society or other organization is now occupying any of the public lands to which this act is applicable, for religious or educational work among the Indians, the Secretary of the Interior is hereby authorized to confirm such occupation to such society or organization, in quantity not exceeding one hundred and sixty acres in any one tract, so long as the same shall be so occupied, on such terms as he shall deem just; but nothing herein contained shall change or alter any claim of such society for religious or educational purposes heretofore granted by law.

Indians selecting lands to be preferred for police, etc. — And hereafter in the employment of Indian police, or any other employes in the public service among any of the Indian tribes or bands affected by this act, and where Indians can perform the duties required, those Indians who have availed themselves of the provisions of this act and become citizens of the United States shall be preferred.

Citizenship to be accorded to allottees and Indians adopting civilized life. — SEC. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law.  And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property.

Secretary of the Interior to prescribe rules for use of waters for irrigation. — SEC. 7. That in cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior be, and he is hereby, authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations; and no other appropriation or grant of water by any riparian proprietor shall be authorized or permitted to the damage of any other riparian proprietor.



SEC. 8. That the provision of this act shall not extend to the territory occupied by the Cherokees, Creeks, Choctaws, Chickasaws, Seminoles, and Osage, Miamies and Peorias, and Sacs and Foxes, in the Indian Territory, nor to any of the reservations of the Seneca Nation of New York Indians in the State of New York, nor to that strip of territory in the State of Nebraska adjoining the Sioux Nation on the south added by executive order. *Lands excepted.*

SEC. 9. That for the purpose of making the surveys and resurveys mentioned in section two of this act, there be, and hereby is, appropriated, out of any moneys in the Treasury not otherwise appropriated, the sum of one hundred thousand dollars, to be repaid proportionately out of the proceeds of the sales of such land as may be acquired from the Indians under the provisions of this act. *Appropriation for surveys.*

SEC. 10. That nothing in this act contained shall be so construed as to affect the right and power of Congress to grant the right of way through any lands granted to an Indian, or a tribe of Indians, for railroads or other highways, or telegraph lines, for the public use, or to condemn such lands to public uses, upon making just compensation. *Rights of way not affected.*

SEC. 11. That nothing in this act shall be so construed as to prevent the removal of the Southern Ute Indians from their present reservation in Southwestern Colorado to a new reservation by and with the consent of a majority of the adult male members of said tribe. *Southern Utes may be removed to new reservation.*

Approved, February 8, 1887.

---

CHAP. 120.—An act to declare a forfeiture of lands granted to the New Orleans, Baton Rouge and Vicksburg Railroad Company, to confirm title to certain lands, and for other purposes. *Feb. 8, 1887.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the lands granted to the New Orleans, Baton Rouge and Vicksburg Railroad Company by the act entitled "An act to incorporate the Texas Pacific Railroad Company and to aid in the construction of its road, and for other purposes," approved March third, eighteen hundred and seventy-one, are hereby declared to be forfeited to the United States of America in all that part of said grant which is situate on the east side of the Mississippi River, and also in all that part of said grant on the west of the Mississippi River which is opposite to and coterminous with the part of the New Orleans Pacific Railroad Company which was completed on the fifth day of January, eighteen hundred and eighty-one; and said lands are restored to the public domain of the United States. *Certain lands granted to New Orleans, Baton Rouge and Vicksburg R. R. Co. forfeited. Vol. 16, p. 579.*

SEC. 2. That the title of the United States and of the original grantee to the lands granted by said act of Congress of March third, eighteen hundred and seventy-one, to said grantee, the New Orleans, Baton Rouge and Vicksburg Railroad Company, not herein declared forfeited, is relinquished, granted, conveyed, and confirmed to the New Orleans Pacific Railroad Company, as the assignee of the New Orleans, Baton Rouge and Vicksburg Railroad Company, said lands to be located in accordance with the map filed by said New Orleans Pacific Railway Company in the Department of the Interior October twenty-seventh, eighteen hundred and eighty-one and November seventeenth, eighteen hundred and eighty-two, which indicate the definite location of said road: *Provided,* That all said lands occupied by actual settlers at the date of the definite location of said road and still remaining in their possession or in possession of their heirs or assigns shall be held and deemed excepted from said grant and shall be subject to entry under the public land laws of the United States. *Certain lands confirmed to New Orleans Pacific R. R. Co., assignee of New Orleans, Baton Rouge and Vicksburg R. R. Co. Proviso. Lands of actual settlers at the time excepted.*

SEC. 3. That the relinquishment of the lands and the confirmation of the grant provided for in the second section of this act are made and shall take effect whenever the Secretary of the Interior is notified that *When grant to be in effect.*



**1022**     FIFTY-FIRST CONGRESS. Sess. II. Ch. 543. 1891.

*Records, etc.*

be deducted and paid to said attorney or attorneys.   That the Secretary of the Interior and the Secretary of the Treasury shall transmit to said Court of Claims, upon its request, certified copies of all records, documents, and papers that relate in any way to the accounts of said Indians under the various treaties with said tribe, and shall furnish such excerpts and statements and accounts regarding the same as may be called for during the progress of said suit and in said suits all claims against the United States on behalf of either of said bands of Indians, or on behalf of one band against the other shall be tried and determined and judgment rendered as shall be found just and right.

*Agreement with Cheyennes and Arapahoes ratified.*

Sec. 13.  The following agreement entered into by the Commissioners named below on the part of the United States, and the Cheyenne and Arapahoe Tribes of Indians on the ——— day of October, eighteen hundred and ninety, and now on file in the Interior Department, signed by the said Commissioners on the part of the United States, and by Left Hand, his mark, and five hundred and sixty-four others, on the part of the said Indians, is hereby accepted, ratified and confirmed, to wit :

"Articles of agreement made and entered into at Darlington, in the Indian Territory, on the ——— day of October, A. D. eighteen hundred and ninety, by and between David H. Jerome, Alfred M. Wilson, and Warren G. Sayre, commissioners on the part of the United States, and the Cheyenne and Arapahoe tribes of Indians, in the Indian Territory.

*Article I.*

### ARTICLE I.

*Lands ceded absolutely.*

"The said Cheyenne and Arapahoe tribes of Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest of every kind and character, in and to the lands embraced in the following described tract of country in the Indian Territory, to-wit : A tract of country west of the ninety-sixth degree of west longitude, bounded by the Arkansas River on the east, the thirty-seventh parallel of north latitude (being the southern boundary line of the State of Kansas) on the north, and the Cimarron or Red Fork of the Arkansas River on the west and south.

*Description.*

*Article II.*

### ARTICLE II.

*Lands ceded subject to allotment.*

"Subject to the allotment of land in severalty to the individual members of the Cheyenne and Arapahoe tribes of Indians, as hereinafter provided for and subject to the conditions hereinafter imposed. for the considerations hereinafter mentioned the said Cheyenne and Arapahoe Indians hereby cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all their claim, title and interest, of every kind and character, in and to the lands embraced in the following described tract of country in the Indian Territory, to-wit :

*Description.*

Commencing at a point where the Washita River crosses the ninety eighth degree of west longitude, as surveyed in the years eighteen hundred and fifty-eight and eighteen hundred and seventy-one; thence north on a line with said ninety-eighth degree to the point where it is crossed by the Red Fork of the Arkansas (sometimes called the Cimarron River) ; thence up said river, in the middle of the main channel thereof, to the north boundary of the country ceded to the United States by the treaty of June fourteenth, eighteen hundred and sixty six, with the Creek nation of Indians; thence west on said north boundary and the north boundary of the country ceded to the United States by the treaty of March twenty first, eighteen hundred and sixty six, with the Seminole Indians, to



STATE'S EXHIBIT 2

123

the one hundredth degree of west longitude; thence south on the line of said one hundredth degree to the point where it strikes the North Fork of the Red River; thence down said North Fork of the Red River to a point where it strikes the north line of the Kiowa and Comanche Reservation; thence east along said boundary to a point where it strikes the Washita River; thence down said Washita River, in the middle of the main channel thereof, to the place of beginning; and all other lands or tracts of country in the Indian Territory to which they have or may set up or allege any right, title, interest or claim whatsoever.

## ARTICLE III

ARTICLE III.

Selections in severalty by Indians.

Out of the lands ceded, conveyed, transferred, relinquished, and surrendered by Article II hereof, and in part consideration for the cession of lands named in the preceding article, it is agreed by the United States that each member of the said Cheyenne and Arapahoe tribes of Indians over the age of eighteen years shall have the right to select for himself or herself one hundred and sixty acres of land, to be held and owned in severalty, to conform to legal surveys in boundary; and that the father, or, if he be dead, the mother, if members of either of said tribes of Indians, shall have a right to select a like amount of land for each of his or her children under the age of eighteen years; and that the Commissioner of Indian Affairs, or some one by him appointed for the purpose, shall select a like amount of land for each orphan child belonging to either of said tribes under the age of eighteen years.

## ARTICLE IV.

ARTICLE IV.

Classification of land.
Selections.

"It is further agreed that the land in said reservation shall be classed as bottom land and grazing land; and, in making selection of lands to be allotted in severalty as aforesaid, each and every Indian herein provided for shall be required to take at least one-half in area, of his or her allotments, of grazing land. It is hereby further expressly agreed that no person shall have the right to make his or her selection of land in any part of said reservation that is now used or occupied for military, agency, school, school-farm, religious, or other public uses, or in sections sixteen and thirty-six in School, etc., sections. each Congressional township, except in cases where any Cheyenne or Arapahoe Indian has heretofore made improvements upon and now uses and occupies a part of said sections sixteen and thirty-six such Indian may make his or her selection within the boundaries so prescribed so as to include his or her improvements, or in that part thereof now occupied and claimed by the Wichita and affiliated bands of Indians described as follows, viz: Commencing at a point in the middle of the main channel of the Washita River, where the ninety-eighth meridian of west longitude crosses the same, thence up the middle of the main channel of the said river to the line of ninety-eight degrees forty minutes west longitude, thence up said line of ninety-eight degrees forty minutes due north to the middle of the main channel of the main Canadian River, thence down the middle of the main Canadian River to where it crosses the ninety-eighth meridian; thence due south to the place of beginning.

"It is further agreed that wherever in said reservation any Indian, Selections on lands now occupied. entitled to take lands in severalty hereunder, has made improvements and now uses and occupies the land embracing such improvements, such Indian shall have the undisputed right to make his or her selection within the area above provided for allotments so as to include his or her said improvements.

124

**1024**          FIFTY-FIRST CONGRESS.  Sess. II.  Ch. 543.  1891.

School, etc., sections.    "It is further agreed that sections sixteen and thirty-six in each Congressional township in said reservation shall not become subject to homestead entry, but shall be held by the United States and finally sold for public school purposes.  It is hereby further agreed that wherever in said reservation any religious society or other organization is now occupying any portion of said reservation for religious or educational work among the Indian the land so occupied may be allotted and confirmed to such society or organization; not, however, to exceed one hundred and sixty acres of land to any one society or organization so long as the same shall be so occupied and used, and such land shall not be subject to homestead entry.

Article V.                          "Article V.

Time for selections.    "All allotments hereunder shall be selected within ninety days from the ratification of this agreement by the Congress of the United States, provided the Secretary of the Interior, in his discretion, may extend the the time for making such selection, and should any Indian entitled to allotments hereunder fail or refuse to make his or her selection of land in that time, then the allotting agent in charge of the work of making such allotments shall, within the next thirty days after said time, make allotments to such Indians, which shall have the same force and effect as if the selection were made by the Indian.

Article VI.                         "Article VI.

Trust titles for allottees.    When said allotments of land shall have been selected and taken as aforesaid, and approved by the Secretary of the Interior, the titles thereto shall be held in trust for the allottees, respectively, for the period of twenty-five years, in the manner and to the extent provided

Vol. 24, p. 388.    for in the act of Congress entitled 'An act to provide for the allotment of land in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes,' approved February eighth, eighteen hundred and eighty-seven; and at the expiration of said period of twenty-five years the titles thereto shall be conveyed in fee simple to the allottees, or their heirs, free from all incumbrances.

Article VII.                        "Article VII

Payment for lands ceded.    "As a further and only additional consideration for the cession of territory and relinquishment of title, claim, and interest in and to lands as aforesaid the United States agrees to pay to the Cheyenne and Arapahoe tribes of Indians one million and five hundred thou-

Distribution.    sand dollars as follows: Two hundred and fifty thousand dollars in cash, to be distributed per capita among the members of said tribes within sixty days after this agreement shall be ratified by the Congress of the United States; two hundred and fifty thousand to be paid out for said Indians under the direction of the Secretary of the Interior, and the remaining one million dollars to be retained in the Treasury of the United States placed to the credit of the said Indians, and, while so retained, to draw five per centum interest per annum, to be paid to said Indians per capita annually.

Annuities.    Nothing herein contained shall be held to affect in anyway any annuities due said Indians under existing laws, agreements, or treaties.

Article VIII.                       "Article VIII

Confirmation of allotments.    "It is further agreed that wherever in said reservation any member of either of said tribes has in pursuance of any laws or under



any rules or regulations of the Interior Department, taken an allotment, such an allotment, at the option of the allottee, shall be confirmed and governed by all the conditions attached to allotments taken under this agreement.

### "ARTICLE IX.

ARTICLE IX.

"This agreement shall have effect whenever it shall be ratified by the Congress of the United States.

Effect.

"In witness whereof the said Commissioners on the part of the United States have hereunto set their hands, and the undersigned members of said tribes, for themselves and their tribes, set their hands the day and year first above written.

"DAVID H. JEROME,<br>
"ALFRED M. WILSON,<br>
"WARREN G. SAYRE,<br>
"Commissioners."

Signatures.

Left Hand, his x mark, and five hundred and sixty-four others.

Sec. 14. That for the purpose of making the allotments provided for in said agreement, including the pay and expenses of the necessary special agent or agents hereby authorized to be appointed by the President for the purpose, and the necessary resurveys, there be, and hereby is, appropriated, out of any money in the Treasury not otherwise appropriated, the sum of fifteen thousand dollars, or so much thereof as may be necessary.

Expenses of allotments.

Sec. 15. That for the purpose of carrying the provisions of foregoing agreement into effect there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of one million five hundred thousand dollars, of which amount the sum of one million dollars shall be placed in the Treasury to the credit of the Cheyenne and Arapahoe Indians, parties to the foregoing agreement, to bear interest at the rate of five per centum per annum, which interest shall be paid to them per capita annually; the balance of five hundred thousand dollars to be expended as provided for in article seven of said agreement, to be immediately available.

Amount placed to credit of Indians in trust.

And the sum of two million nine hundred and ninety-one thousand four hundred and fifty dollars be, and the same is hereby, appropriated out of any money in the Treasury not otherwise appropriated, to pay the Choctaw and Chickasaw Nations of Indians for all the right, title, interest, and claim which said nations of Indians may have in, and to certain lands now occupied by the Cheyenne and Arapahoe Indians under executive order; said lands lying south of the Canadian River, and now occupied by the said Cheyenne and Arapahoe Indians, said lands have been ceded in trust by article three of the treaty between the United States and said Choctaw and Chickasaw Nations of Indians, which was concluded April twenty-eighth, eighteen hundred and sixty-six, and proclaimed on the tenth day of August of the same year, and whereof there remains, after deducting allotments as provided by said agreement, a residue ascertained by survey to contain two million three hundred and ninety-three thousand one hundred and sixty acres; three-fourths of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Choctaw Nation to receive the same, at such time and in such sums as directed and required by the legislative authority of said Choctaw Nation, and one-fourth of this appropriation to be paid to such person or persons as are or shall be duly authorized by the laws of said Chickasaw Nation to receive the same, at such times and in such sums as directed and required by the legislative authority of said Chickasaw Nation;

Payment to Choctaws and Chickasaws for interest in lands occupied by Cheyennes and Arapahoes.

Vol. 14, p. 786.

Division of payment.

