ORIGINAL

*1054932255*

BECKHAM COUNTY
FILED

MAR 29 2023

BY DONNA HOWELL, COURT CLERK
_____ DEPUTY

IN THE DISTRICT COURT OF BECKHAM COUNTY

STATE OF OKLAHOMA

KENNETH H. TIBBETS, )
    Petitioner, )
v. ) Case No. CF-2015-188
  ) MA-2023-196
STATE OF OKLAHOMA, )
    Respondent. )

FILED
COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

MAR 31 2023

JOHN D. HADDEN
CLERK

## POST CONVICTION FINDINGS

**ORIGINAL CHARGES:**
    Count 1: Robbery with a Weapon After Former Felony Conviction (Life imprisonment)
    Count 2: Possession of a Firearm After Former Felony Conviction (10 years)
    Count 3: Kidnapping After Former Felony Conviction (Life imprisonment)
    Count 4: Kidnapping After Former Felony Conviction (Life imprisonment)
    Count 5: Attempted Robbery with a Dangerous Weapon After Former Felony Conviction (Life Imprisonment)
    Count 6: Attempted Robbery with a Dangerous Weapon After Former Felony Conviction (Life Imprisonment)
    Count 7: Possession of a Firearm After Former Felony Conviction (10 years)

**JUDGMENT AND SENTENCE DATE:** March 30, 2016

**APPLICATION FOR POST CONVICTION RELIEF FILED:** May 16, 2018

**RESPONSE OF DISTRICT ATTORNEY FILED:** December 19, 2018

**WAS FORM AUTHORIZED BY COURT OF CRIMINAL APPEALS USED?** Yes.

**PROCEEDINGS IN COURT OF CRIMINAL APPEALS, IF ANY:** C-2016-419 (Certiorari denied.)

**IS THERE A GENUINE ISSUE OF MATERIAL FACT?** No

**IS AN EVIDENTIARY HEARING NECESSARY?** No

**MATERIAL CONSIDERED BY THE REVIEWING COURT:**
    Application for Post-Conviction Relief filed on May 16, 2018;
    State's Response to Application for Post-Conviction Relief filed December 19, 2018;
    Docket Sheet in CF-2015-188;
    Amended Information filed January 19, 2016;
    Plea of Guilty Summary of Fact filed February 10, 2016;

1

**EXHIBIT 18**

Notice of Intent to Declare Insanity Defense filed January 20, 2016;
Brief of Petitioner filed October 10, 2016, in C-2016-419 (Court of Criminal Appeals);
Summary Opinion Denying Certiorari filed September 15, 2017 in Beckham County; and
Judgment and Sentence filed July 15, 2016.

## FINDINGS OF FACT:

1. Petitioner entered a plea of guilty on February 20, 2016, and was sentenced on March 30, 2016. Petitioner was represented by attorney Alicia Sorelle at the time of plea.

2. A Notice of Intent to Declare Insanity as a Defense was filed on January 20, 2016.

3. Petitioner filed a Motion to Withdraw Plea on April 6, 2016. Conflict counsel was appointed. A hearing on the motion was held on May 11, 2016, and the Honorable Doug Haught denied the motion.

4. Petitioner timely sought a writ of certiorari. He alleged eight (8) propositions of error including ineffective assistance of counsel. Petitioner claimed trial counsel was ineffective due to failure to investigate Petitioner's mental health issues, failure to challenge the factual basis of Petitioner's plea, failure to advise Petitioner of the sentencing ranges, failure to object to double jeopardy, failure to object to privileged material being introduced at sentencing, failure to object to inappropriate comments by the prosecutor, and failure to invoke the rule of sequestration at sentencing. The writ was denied and the Judgment and sentence affirmed.

## CONCLUSIONS OF LAW:

**I.   The waiver doctrine found in 20 O.S. §1086 does not apply to fundamental constitutional claims.**

Insofar as this proposition applies to the Petitioner's claims, it will be discussed with each individual Proposition below.

## II. Petitioner was denied constitutionally effective assistance of counsel due to an actual conflict of interest with his retained counsel of record.

Petitioner alleges that his wife hired attorney Alicia Sorelle to represent him. He further alleges that Celo Harrel, his wife's attorney in a divorce case against Petitioner, recommended Ms. Sorelle, and that Sorelle and Harrel were law partners.

Petitioner has established that Sorelle and Harrel office out of the same physical address, but there is no evidence that they were law partners. In fact, the letterhead of each attorney attached as Exhibit 21 and Exhibits 26-30 to the Post-Conviction Application show that Sorelle and Harrel were both sole practitioners. Exhibits 22 and 23 show that they had different telephone numbers.

Lawyers in a firm are prohibited from representing a client if "any one of them practicing alone would be prohibited from doing so..." Oklahoma Rules of Professional Conduct Rule 1.10(a). A firm is defined as "a lawyer or lawyers in a law partnership, professional corporation, sole proprietorship or other association authorized to practice law..." Oklahoma Rules of Professional Conduct Rule 1.0(c). There is no evidence that Sorelle and Harrel were associated in any way other than officing in the same building.

Petitioner seems to argue that Sorelle had a conflict of interest because a lawyer in the same building represented Petitioner's wife in a potential divorce against him. Putting aside the fact that there is no evidence of a law firm relationship between the two lawyers, there is no evidence that Sorelle's representation of Petitioner in a criminal case would be directly adverse to his wife, or that there was

3

a significant risk that Harrel's representation of his wife would materially limit Sorelle's representation of him. Oklahoma Rules of Professional Conduct Rule 1.7(a).

Petitioner further alleges that Alicia Sorelle "shared a personal and vicarious relationship" with the victims, the grandchildren of the victims, and Judge Haught. Petitioner relies solely on evidence that Alicia Sorelle is Facebook friends with Dana Southall, Jenna Dodson, and Judge Haught for his allegation of conflict of interest. Petitioner has not established that Dana Southall and Jenna Dodson are related to any victim in this case. Even taking the evidence in the light most favorable to Petitioner, the existence of a Facebook relationship with a granddaughter of a victim does not establish a conflict of interest for an attorney. Petitioner has also failed to establish any conflict of interest due to a purported relationship with Judge Haught.

The claim of ineffective assistance of counsel due to a conflict of interest is denied. The Court further finds that this claim has been waived pursuant to 22 O.S. §1086. Petitioner certainly knew about the alleged conflict of interest between Sorelle and Harrel at the time he appealed the plea.

Proposition I is denied.

### III. The District Court of Beckham County was without subject matter jurisdiction to prosecute Petitioner.

Petitioner alleges that the District Court of Beckham County, State of Oklahoma, did not have jurisdiction to prosecute him pursuant to *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020).

It is undisputed that the location of the crime is within the historical boundaries of the Cheyenne and Arapaho Reservation. Petitioner asserts that the reservation still exists, and the State of Oklahoma cannot prosecute him for a crime committed in Indian Country. In *Murphy v. Royal*, 875 F.3d 896, 904 (10th Cir. 2017), *aff'd sub nom. Sharp v. Murphy*, 140 S. Ct. 2412 (2020), the Tenth Circuit explained:

> All land within the borders of an Indian reservation – regardless of whether the tribe, individual Indians, or non-Indians hold title to a given tract of land – is Indian country unless Congress has disestablished the reservation or diminished its borders.

The United States Supreme Court recently addressed the application of the Major Crimes Act to crimes committed within the Creek Nation in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). Justice Gorsuch succinctly stated the analysis for determining disestablishment of a reservation:

> To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress.

*McGirt* at 2462. It is not within the Court's role to disestablish a reservation.

> But wishes don't make for laws, and saving the political branches the embarrassment of disestablishing a reservation is not one of our constitutionally assigned prerogatives. "[O]nly Congress can divest a reservation of its land and diminish its boundaries." *Solem*, 465 U.S., at 470, 104 S.Ct. 1161. So it's no matter how many other promises to a tribe the federal government has already broken. If Congress wishes to break the promise of a reservation, it must say so.

*Id.* Congress must explicitly state "an act of cession, the transfer of a sovereign claim from one nation to another." *Id. McGirt* sets out examples of language used by Congress to withdraw a reservation: words such as "cession," an unconditional commitment to compensate the tribe for its land, and language evidencing total surrender of tribal interests. *Id.*

5

The General Allotment Act of February 8, 1887, authorized the President of the United States to allot portions of reservation land to tribal members and sell surplus land to settlers. The Jerome Commission was established to negotiate with the individual tribes. The Creek Nation's treaty allotted all lands belonging to the Creek Nation "among the citizens of the tribe". *Creek Allotment Agreement* ratified March 1, 1901, ch 676 Fifty-Sixth Congress. The Creek Nation's surplus land (except land reserved for some public purposes such as schools and courthouses) was further allotted to tribal members to equalize the value of allotments. *Id.* The allotment deeds conveyed "all right, title, and interest of the Creek Nation and of all other citizens in and to the lands embraced in his allotment certificate". *Id.* The conveyances further relinquished all right, title and interest of the United States in the deeded lands. *Id.*

The Cheyenne and Arapaho Tribes' agreement was codified in The Act of March 3, 1891. Under this treaty, Cheyenne and Arapaho tribal members could each choose 160 acres for an individual allotment. The Cheyenne and Arapaho Tribes were paid $1,500,000.00 as consideration for the unallotted land. (The actual payment of these funds was problematic, but that issue is not before the Court.)

The Act of March 3, 1891, stated that, subject to the allotment of land to the individual members of the tribe:

> Cheyenne and Arapahoe tribes of Indians hereby **cede, convey, transfer, relinquish and surrender forever and absolutely, without any reservation whatever express or implied, all claim, title, and interest, of every kind and character**, in and to the lands embraced in the following described tract of country in the Indian Territory, to-wit:

The Act goes on to describe an area of land that appears to include the location of the subject offense.

6

The funds were to be paid to the Cheyenne and Arapaho Tribes in consideration for "...the **cessation of territory and relinquishment of title, claim, and interest** in and to lands as aforesaid...". The Tenth Circuit has interpreted this language as evincing a "manifest purpose to dissolve tribal government and assimilate the Indian allottees in the community". *Ellis v. Page*, 351 F.2d 250, 252 (10th Cir. 1965). In a hunting rights case in the Tenth Circuit, the Cheyenne and Arapaho Tribes did not contest the district court's finding that the reservation was disestablished. *Cheyenne-Arapaho Tribes of Oklahoma v. State of Oklahoma*, 618 F.2d 665, 667 (10th Cir. 1980).

The language in the treaty with the Cheyenne and Arapaho Tribes is very different from the language in the Creek Nation's Treaty. The plain language of the Act appears to divest the Cheyenne and Arapaho Tribes of all rights to the surplus land. The language "cede... relinquish and surrender forever and absolutely" along with the receipt of consideration for "cessation of territory" rises to the level of an act of cession. The Cheyenne and Arapaho Tribe sold their surplus unallotted lands to the Federal Government without reserving any interest and thereby disestablished the reservation.

The Court notes that the Cheyenne and Arapaho Tribes made their agreement only four years after the Dawes Act, and ten years before the Creek Nation finally signed a treaty.

Pursuant to the analysis set out in *McGirt*, the Court finds that the Cheyenne and Arapaho Treaty, which was ratified by Congress through the Act of March 3, 1891, disestablished the Cheyenne and Arapaho Tribes' Reservation.

Indian Country includes Indian reservations, dependent Indian Communities, and Indian allotments to which the Indian titles have not been extinguished. 18 USC §1151; *State v. Klindt*,

7

1989 OK CR 75, 782 P.2d 401, 403. There is no evidence that the crime occurred on Trust Land, land owned by the Tribe, or an existing Indian allotment.

The Oklahoma Court of Criminal Appeals considered the Kiowa allotment and cession agreement and found it disestablished the Kiowa Comanche Apache Reservation. *Martinez v. State* 2021 OK CR 40 ¶18-24. In an unpublished opinion, the Court of Criminal Appeals found the Cheyenne and Arapaho agreement contained "almost identical language" as the Kiowa agreement, and found the historic Cheyenne and Arapaho Reservation was disestablished by Congress. *State v. Whitebuffalo*, F-2021-429 at page 8.

Further, the Oklahoma Court of Criminal Appeals has ruled that *McGirt* does not apply retroactively to convictions already final when that ruling was announced. *Matloff v. Wallace*, 2021 OK CR 21 ¶40. Petitioner's convictions were final for at the time *McGirt* was decided, and relief is further barred by the ruling in *Matloff*.

Proposition III is denied.

### IV. Petitioner was denied constitutionally effective assistance of counsel due to the deficient performance of his attorney and the resulting prejudice Petitioner suffered, which was the proximate result of conflicting interests.

To prevail on his claims of ineffective assistance of trial counsel, Petitioner must show counsel's (1) deficient performance, by demonstrating that counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 669, 687-689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Petitioner again argues that Ms. Sorelle was ineffective due to conflict of interest. This claim was addressed in Proposition II above, and is denied.

8

Petitioner also argues that Sorelle failed to investigate or conduct pretrial preparation. This is a thinly veiled attempt to raise the claim that Sorelle failed to follow through with the investigation of Petitioner's insanity defense. Petitioner argued this in his Petition for Certiorari. Brief of Petitioner page 41-42. This claim is res judicata.

Petitioner further argues that Sorelle compelled him to plead and give up his right to trial. The voluntariness of his plea was previously decided by the Court of Criminal Appeals. This claim is res judicata.

Proposition IV is denied.

### V. Petitioner was denied constitutionally effective assistance of appellate counsel.

Post-conviction claims of ineffective assistance of appellate counsel are reviewed under the standard for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Smith v. Robbins*, 528 U.S. 259, 289, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000). *Logan v. State* 2014 OK CR. 2 ¶5. Petitioner must show (1) deficient performance (objectively unreasonable conduct by counsel) and (2) resulting prejudice (reasonable probability that the appeal would have had a different result absent counsel's error). *Id.* This Court must consider the merits of the omitted appellate issues and ask "is there a reasonable probability that raising the omitted issues would have resulted in a different outcome in the direct appeal?" *Id.* at ¶6.

Petitioner fails to explicitly identify any claims omitted from his appeal. The Court will assume that Petitioner meant to allege appellate counsel was ineffective due to failure to raise Propositions II, III, and IV. The record reflects that appellate counsel argued ineffective

9

assistance of trial counsel. The Court has found that trial counsel did not have a conflict of interest and that the crime was not committed within Indian Country. Therefore, appellate counsel was not ineffective for failure to raise these claims. Proposition V is denied.

### ORDER: IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT PETITIONER'S APPLICATION FOR POST CONVICTION RELIEF IS DENIED.

**DATE:** March 29, 2023

**COURT REPORTER PRESENT:** None

_____
JILL C. WEEDON
JUDGE OF THE DISTRICT COURT

I, DONNA HOWELL, Court Clerk for Beckham County Oklahoma hereby certify that the foregoing is a true correct and complete copy of the instrument herewith set out as appears of record in District Court Clerk's Office of Beckham County, Oklahoma.
this 29 day of March, 2023
DONNA HOWELL, Court Clerk
By _____ DEPUTY